Frank Orlando Wells (F06517)
4001 Hwy 104
Ione CA 95640

[ **FILED** ]

FEB 2 0 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

ATTN: CLERK OF THE COURT

I, Orlando Wells am the Plaintiff in Wells v. Macomber.
I electronically filed my case (Civil Action Verified complaint for damages) from Mule Creek State Prison Feb. 13, 2025 from E-Facility law library.

I filed only the 25 allotted pages; I have enclosed the additional/remaining pages of my verified complaint and request they be added to the documents electronically filed to complete the filing of my entire complaint.

I have also enclosed the Application to Proceed Inform Pauperis w/ Inmate Account Statement as required.

Enclosed Documents:
- Pages 26-27 of verified Complaint
  (Claim II last Page and Relief Requested)

- Exhibits pages 28 - 38
  - Medical Records report (Hematology)
  - Water Treatment report
  - PLN ARTICLE
  - PHOTOCOPY of sign

Respectfully Submitted,
Frank Orlando Wells
Plaintiff

2/13/2025

That failure resulted in Plaintiff becoming medically affected and is defined as Intentional Negligence. The decision to omit or fail to inform Plaintiff or any incarcerated citizens of inherent dangers of ingesting or using contaminated water dispersed at Mule Creek State Prison is a dconsicious and intentional act on the part of the Defendants. Such actions which knowingly and negatively impact Plaintiff's conditions of confinement constitute and Eight Amendment Violation.

The acts and omissions of the Defendants are the direct and proximate cause of damage to Plaintiff and the negative impact to Plaintiff's conditions of confinement and are therefore the liable and responsible parties. Plaintiff is therefors entitles to relief in the form of compensatory and punitive damages and any other relief deemed appropriate by this Honorable Court upon proof of liability.

RELIEF REQUESTED

Plaintiff has demonstrated a pattern and practice of the defendants which have resulted in Plaintiff suffering Medical conditions (LGL Lukemia) and has negatively impacted Plaintiff's conditions of Confinement.

Plaintiff has submitted supporting evidence to establish a legitimate claim for damages in accordance with the law and procedural standards within the local rules of Civil Proceedure.

Plaintiff has submitted affidavits, reports and case law citations as proof in suuport of claim for damages and that Defendants are the responsible and lible parties and had prior knowledge that could have prevented harm/injuries to Plaintiff.

Therefore Plaintiff seeks a total of $30,000,000 in damages to be awarded according to proof and any other relief deemed appropriate by this Honorable Court.

Plaintiff now comes requesting Trial by Jury to resolve issues presented and receive approriate relief for injuries sustained as a result of Defendant's Intentional Negligence. I Frank O. Wells declare the foregoing to be true and correct under penalty of perjury.

1/07/2025                                    Respectfully Submitted,


                                             Frank Orlando Wells
                                                  Plaintiff



## Declaration of Custodian of Records
## Department of Corrections and Rehabilitation,

### <u>MULE CREEK STATE PRISON</u>
*(Facility)*

I, <u>Mickayla Hartwig, HEALTH RECORDS TECH. I,</u> am the duly authorized custodian of medical
      NAME                       TITLE
records and/or other qualified witness for the Department of Corrections and Rehabilitation.

A medical file is maintained on each inmate housed in the California Department of Corrections and
Rehabilitation. The file is maintained by the medical department of the institution housing the inmate,
and transferred with the inmate to any other institution.

Documents relating to an inmate's medical examinations, treatment and care are maintained in the
medical file. The contents enclosed represent the latest information received in written form. It may be
outdated as the result of new or revised information, which has not yet been received or filed. The
documents and entries in documents pertaining to an inmate are prepared at or near the time of the
examination, treatment or care of an inmate by persons with personal knowledge of the examination,
treatment or care of the inmate.

The copies of the Unit Health Record presented herein, contain the true documents that represent current
information received in written form, for inmate:

| Wells, Frank | F06517 |
|---|---|
| Name of Inmate/Patient | CDC Number |

and maintained in the regular course of business by the California Department of Corrections and
Rehabilitation.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and
correct to the best of my knowledge and belief.

    <u>HRT I, Mickayla Hartwig</u>          *Mickayla Hartwig*
      Print Name and Title               Signature

                                    2/7/2025
                                      Date

**Received Telemed**

F06517

RECEIVED
DEC 1 9 2024
@1219
By S. Moshu

Oncology Office/Clinic Note

\* Final Report \*

WELLS, FRANK ORLANDO - 117-251-16

*Hematology*

| | |
|---|---|
| Result Type: | Oncology Office/Clinic Note |
| Result Date: | December 17 2024 14:17 PST |
| Result Status: | Auth (Verified) |
| Result Title: | Oncology Office Visit Note |
| Performed By: | Mehboob, MD, Ather on December 19 2024 08:58 PST |
| Verified By: | Mehboob, MD, Ather on December 19 2024 08:58 PST |
| Encounter Info: | 37702003487, 85, Outpatient, 12/17/2024 - 12/17/2024 |

## \* Final Report \*

Patient: **WELLS, FRANK ORLANDO**      MRN: **117-251-16**      FIN: **37702003487**
Age: **61 years**    Legal Sex: **MALE**    DOB: **09/16/1963**

### Chief Complaint
Lymphocytosis

### History (History of Present Illness)
This is a 61-year-old male referred for elevated white blood count and once episode of polycythemia.

He states that he feels that he has heaviness and sinus pressure and at night it seems like sinusitis and he cannot breathe properly and he gets a panic attack. He denies any fevers, chills, night sweats, and denies any enlarged lymph nodes. He denies any excessive fatigue. He had been treated for hepatitis C three to four years ago per patient.

PET/CT on 04/11/2023 showed on the posterolateral left lung lower lobe pleural-based nodule is stable compared to previous PET/CT on 11/03/2023 and remains not hypermetabolic which further lowers the suspicion for malignancy. He also has a history of smoking.

Sinus X-ray on 06/04/2024 was negative.

Flow cytometry on 05/17/2024 showed increased large granular T-cells (56% lymphoid cells & 48% total cells) with dim expression of CD5 and CD7. T-cells show inverted CD4:CD8 ration of 0.4:1.0. B-cells are polyclonal.

No JAK2 mutation noted on 05/22/2024.

History of smoking. He smoked for 20 years but stopped smoking for 30 years.

Labs
11/08/24: T-cell clonality panel showed T-cell receptor positive. PCR analysis of the T-cell receptor gamma and beta genes were performed but multiplex PCR followed by capillary electrophoresis. The positive result suggests the presence of a clonal population of T-cells except with immature lymphoid malignancies where clonal TCR rearrangements may occur in other lineages.
11/08/24: WBC 9, hemoglobin 17.8, hematocrit 54, platelet 235, absolute neutrophil 2736.

Interval History
The patient is here for a follow-up via telemed. Per patient, he underwent ear surgery on 11/18/24. The operative notes are not available on the records. He is still recovering from surgery and overall doing well. He denies any fevers or chills.

### Allergies
No active allergies

### Staging Information
No information available

### Problem List
Active Problems
   No qualifying data
Inactive Problems
   No qualifying data

### Medications

### New Prescriptions
None

### Changed
None

### Unchanged
None

### Discontinued
None

RECEIVED
DEC 20 2024
BY:

Received Telemed

Oncology Office/Clinic Note                                         WELLS, FRANK ORLANDO - 117-251-16

* Final Report *

He denies any history of rheumatoid.

**Review of Systems**
Constitutional: Negative, No fever, No chills, No weakness.   .
Eye: No blurring.
Ear/Nose/Mouth/Throat: Negative except as documented in history of present illness.
Respiratory: Negative, No shortness of breath, No sputum production, No hemoptysis, No apnea.
Cardiovascular: No bradycardia, No tachycardia.
Gastrointestinal: No vomiting, No diarrhea, No constipation, No hematemesis.
Genitourinary: No dysuria, No hematuria.
Hematology/Lymphatics: No bruising tendency, No bleeding tendency.
Endocrine: Negative except as documented in history of present illness.
Immunologic: No recurrent fevers, No recurrent infections.
Musculoskeletal: Negative except as documented in history of present illness.
Integumentary: Negative except as documented in history of present illness.
Neurologic: Alert and oriented X4, No confusion.
Psychiatric: Negative except as documented in history of present illness.

**Physical Exam**

**Vitals and Measurements**
Blood pressure 102/71
Pulse rate 86
O2 Stat 96%
Respiratory 16
Temperature 36.6
Weight 82.9 kgs, consistent from the last a couple of months.

**Assessment/Plan**

This is a 61-year-old male referred for elevated white blood count. He states that he feels that he has heaviness and sinus pressure and in the night it seemed like sinusitis and he cannot breathe properly and he gets a panic attack. He denies any fevers, chills, night sweats, and denies any enlarged lymph nodes. He denies any excessive fatigue. He had been treated for hepatitis C three to four years ago per patient.

PET/CT on 04/11/2023 showed on the posterolateral left lung lower lobe pleural-based nodule is stable compared to previous PET/CT on 11/03/2023 and remains not hypermetabolic which further lowers the suspicion for malignancy.

05/04/2024 labs showed WBC 7.3, hemoglobin 18.6, hematocrit 55.4. Hepatitis C antibody reactive.

05/17/2024 Flow cytometry showed increased large granular T-cells (56% lymphoid cells & 48% total cells) with dim expression of CD5 and CD7. T-cells show inverted CD4:CD8 ration of 0.4:1.0. B-cells are polyclonal. Molecular study for T-cell receptor gene rearrangement (Test code: 91445) may be performed to rule out the presence of a clonal population. Granulocytic cells are unremarkable. Patient hs erythrocytosis. If there is clinical suspicion of myeloproliferative neoplasm, JAK2 mutation analysis, BCR-ABL1 PCR or an expanded MPN mutation panel (test code 91401) can be ordered. No JAK2 mutation noted on 05/22/2024.

07/03/2024: Since his last visit, he has been doing well. Denies any fever, headaches, night sweats, or blurred vision.

09/03/24

Printed by: Vasquez, Cynthia A
Printed on: 12/19/2024 12:13 PST

Oncology Office/Clinic Note

WELLS, FRANK ORLANDO - 117-251-16

* Final Report *

The following labs were reviewed:
07/17/24, which showed WBC 9.2, hemoglobin at 18.3, platelet at 238, lymphocytes high at 5612.
05/14/2024: JAK2 exon 12 mutation not detected, JAK2 V617F not detected.
07/17/2024: BCR-ABL P190 P210 not detected.
07/17/24 T-cell clonality panel: Specimen was positive for detection of clonal T-cell receptor gamma chain gene rearrangement with PCR, which suggests the presence of a clonal population of T-cells except with immature lymphoid malignancies where clonal TCR-gamma rearrangements may occur in other lineages. The positive result should be interpreted in the context of the patient's other clinical and pathologic features and should not be used as the sole criterion for diagnosing malignancy. Certain conditions may yield a false positive result, including, but not limited to, autoimmune diseases, congenital and acquired immune deficiency syndromes and reactive expansions in blood.

A weak peak is identified in the T-cell Beta rearrangement, which appears in the same location on repeat testing/ This finding may represent a monoclonal peak or a non-specific preferential amplification of a random clone. Repeat testing in 2-3 months is recommended, clinical correlations are necessary.

08/27/24 CT chest showed benign left lower lobe lung nodule.

T-cell clonality panel done 11/09/24 showed T-cell receptor positive,
12/17/24: Patient is still recovering from ear surgery. He is overall doing well. Labs from 11/08/24 was reviewed. CBC showed WBC 9, hemoglobin 17.8, hematocrit 54, platelet 235, absolute neutrophil 2736. T-cell clonality panel done on 11/08/24 showed T-cell receptor positive. PCR analysis of the T-cell receptor gamma and beta genes were performed but multiplex PCR followed by capillary electrophoresis. The positive result suggests the presence of a clonal population of T-cells except with immature lymphoid malignancies where clonal TCR rearrangements may occur in other lineages. The findings are concerning for slow growing possible LGL leukemia. Needs to be evaluated for confirmation. If the diagnosis is confirmed, will need to monitor with blood work every few months. Follow-up in 3 months with CBC.

Problem List and Recommendations
#) Lymphocytosis, suspected of LGL leukemia.
 - Reviewed available labs from 05/14/2024 and flow cytometry from 05/17/2024 with the patient.
 - The flow cytometry results showed an increase in large granular T cells (56% lymphoid cells & 48% total cells). JAK2 mutation was done regarding polycythemia, but we don't have JAK2 V617 mutation or BCR-ABL mutation results, which we would request at this time.
 - Labs from 11/08/24 was reviewed. CBC showed WBC 9, hemoglobin 17.8, hematocrit 54, platelet 235, absolute neutrophil 2736.
 - T-cell clonality panel done on 11/08/24 showed T-cell receptor positive. PCR analysis of the T-cell receptor gamma and beta genes were performed but multiplex PCR followed by capillary electrophoresis. The positive result suggests the presence of a clonal population of T-cells except with immature lymphoid malignancies where clonal TCR rearrangements may occur in other lineages.
 - Will monitor to rule out any autoimmune disorders, which also can lead to false positive results of these T-cell receptor gene rearrangement studies. Occasionally, false positive results can be seen in certain conditions such as autoimmune diseases, congenital, and acquired degree deficiency syndromes and reactive inflammatory expansion in blood. These need to rule out.
 - Reviewed labs including ANA, rheumatoid factor etc, which were all negative.

Oncology Office/Clinic Note

* Final Report *

May consider allergic consult to look for any acquired immune deficiency syndromes and reactive and acquired immunedeficiency syndrome.
- Follow-up in 3 months with CBC

#Lung nodule
-Patient underwent CT chest without contrast on 08/27/24, which revealed benign left lower lobe lung nodule.

#Polycythemia
- BCR-ABL P190 P210 not detected in 07/2024.

#Lymphocytosis

- Also recommended an autoimmune workup, a rheumatology evaluation as autoimmune diseases can give false positive results. If other etiologies are ruled out and the patient continues to have elevated lymphocytes and positive T-cell receptor rearrangement will meet the criteria for low-grade leukemia such as LGL.

#Sinusitis
- Sinus X-ray on 06/04/2024 was negative.

- Return in 3 months with CBC with differential.

Virtual Visit (Tele-medicine)
Confirmed with the patient (and/or representative; such as parent) that they have chosen to receive care through the use of virtual visit. Explained that Virtual Visit enables health care providers at different locations to provide effective and convenient care through the use of technology. As with any health care service, I discussed with the patient that there are risks associated with the use of virtual visits, including equipment failure, poor audio connection, and information security issues. I explained that through a virtual visit, a physical examination cannot be done and if necessary, they may need to go to a clinic to complete the assessment.

I verified patient identity with two identifiers including full name and date of birth, and that the patient is an established patient in my practice.

The risks, benefits and alternatives of virtual visits were explained to the patient, questions were answered, and consent was obtained to use a virtual visit for medical care for this encounter.

I conducted this encounter from the clinic via secure, live, face-to-face video conference with the patient.

Time Spent: >21 minutes

Scribed by Sadia Islam Badhan, acting as medical scribes for Mehboob, MD, Ather on 12/17/2024.

**Signature Line**

Printed by: Vasquez, Cynthia A
Printed on: 12/19/2024 12:13 PST

Oncology Office/Clinic Note

WELLS, FRANK ORLANDO - 117-251-16

* Final Report *

Electronically signed by:  Mehboob, MD, Ather
Signed on: 19-Dec-2024 08:58 PST

**Completed Action List:**
* Modify by Mehboob, MD, Ather on December 17 2024 14:18 PST
* Modify by Badhan, Scribe, Sadia Islam on December 17 2024 18:32 PST
* Perform by Mehboob, MD, Ather on December 19 2024 08:58 PST
* Sign by Mehboob, MD, Ather on December 19 2024 08:58 PST Requested by Badhan, Scribe, Sadia Islam on
December 17 2024 18:33 PST
* VERIFY by Mehboob, MD, Ather on December 19 2024 08:58 PST

Progress Note-Nurse                                              WELLS, FRANK ORLANDO - F06517
* Final Report *


# * Final Report *


**SPECIALTY: TELEMED HEMATOLOGY CONSULT**
**PROVIDER: Dr. Mehboob**

**GENERAL:** "I'm not too bad. Just a little tired." NAD. Ambulates with steady gait. A&O x4. VS stable.

Active Problems (15)
Allergic rhinitis
Atopic dermatitis
Chronic pain syndrome
Disp fracture of neck of left second metacarpal bone with malunion
Elevated lymphocytes
Former smoker
Hearing impairment
History of COVID-19
History of hepatitis C
Hypertension
Major depressive disorder, Recurrent episode, In partial remission
Mild persistent asthma
Noncompliance with treatment
Obesity
Urolithiasis

**HEENNT:** No visual concerns. Speech clear. Neck supple. Hearing impaired.
**CARDIAC/PULMONARY:** HR WNL, respirations even & unlabored. No CP/SOB.
**ABD:** Asymptomatic.
**SKIN:** Skin color appropriate for ethnicity, warm & dry. No obvious rashes.
**EXTREMITIES:** MAE.

**RECOMMENDATIONS:** *See Consultants Report: Possible LGL Leukemia, further testing needed. IP aware. F/U in approximately 4 months.

*This progress note is an overview of the exam performed by the RN at the time of the specialty appointment. All pertinent pre-clinic findings were reported to the provider. The provider will record their own assessment independent from the RN. The RN assumes no responsibility for comprehensive documentation produced by the consulting provider*

**Signature Line**
Electronically Signed on 12/17/2024 02:26 PM PST

| | |
|---|---|
| Result type: | Progress Note-Nurse |
| Result date: | December 17, 2024 14:23 PST |
| Result status: | Auth (Verified) |
| Result title: | TELEMED HEMATOLOGY-Dr. Mehboob |
| Performed by: | Massingale, Jill RN on December 17, 2024 14:26 PST |
| Verified by: | Massingale, Jill RN on December 17, 2024 14:26 PST |

Progress Note-Nurse
* Final Report *

WELLS, FRANK ORLANDO - F06517

Massingale, Jill RN, RN

**Completed Action List:**
* Perform by Massingale, Jill RN on December 17, 2024 14:26 PST
* Sign by Massingale, Jill RN on December 17, 2024 14:26 PST
* VERIFY by Massingale, Jill RN on December 17, 2024 14:26 PST

| | |
|---|---|
| Result type: | Progress Note-Nurse |
| Result date: | December 17, 2024 14:23 PST |
| Result status: | Auth (Verified) |
| Result title: | TELEMED HEMATOLOGY-Dr. Mehboob |
| Performed by: | Massingale, Jill RN on December 17, 2024 14:26 PST |
| Verified by: | Massingale, Jill RN on December 17, 2024 14:26 PST |

# Mule Creek State Prison Compliance Issues and Regulatory Strategy

waterboards.ca.gov/centralvalley//water_issues/enforcement/mule_creek_state_prison/

## Facility Background and Overview

The Mule Creek State Prison facility (MCSP) is owned and operated by the California Department of Corrections and Rehabilitation (CDCR). MCSP is located approximately 1 mile west of the City of Ione, California, and approximately 10 miles west of the City of Jackson. Mule Creek runs through the center of the facility.

The Central Valley Regional Water Quality Control Board (Central Valley Water Board) regulates the operations that occur at the MCSP facility with several water quality permits. Each permit has prohibitions, conditions, and requirements to operate and monitor the covered component such that beneficial uses are not impacted, and environmental health is protected:

- The wastewater collection system is regulated under the Sanitary Sewer System General Order (SSO General Order), Water Quality Order No. 2006-0003-DWQ.
- The wastewater treatment plant, effluent storage reservoir, and on-site land application areas are regulated by the Waste Discharge Requirements (WDRs) Order R5-2015-0129 from the Waste Discharge to Land Permitting Program.
- The storm water discharge to Mule Creek is regulated under the National Pollutant Discharge Elimination System General Permit for Waste Discharge Requirements for Storm Water Discharges from Small Municipal Separate Storm Sewer Systems (MS4), WQ Order 2013-0001-DWQ, as amended (Small MS4 General Permit).
- CDCR has also submitted a No Exposure Certification for the Industrial Stormwater General Permit (IGP).

The scope, primary concerns, and compliance strategy of each of these permits is described in the modules below, along with links to the program pages, permits, associated monitoring reports, enforcement actions, and program links.

## Waste Discharge to Land Requirements

WDRs Order R5-2015-0129 defines the requirements, prohibitions, monitoring, and reporting associated with the wastewater treatment plant, effluent storage reservoir, and on-site land application areas. A blend of domestic and industrial wastewater is generated, treated, and disposed of at MCSP. Currently, MCSP houses approximately 4,000 inmates and employs 1,250 CDCR staff full time. MCSP generates an unknown volume of industrial waste from several industrial operations, which is discharged to the sanitary sewer system. These

operations include a coffee roaster, meat processor and smokehouse, textile manufacturing operation, and a large-scale laundry operation that serves several other prisons across the state. In addition, MCSP receives an unknown amount of domestic waste flows from the California Department of Forestry Fire Academy and a small amount of wastewater from the closed Preston Youth Authority facility, both located adjacent to MCSP. These wastewater flows are combined and treated at the on-site wastewater treatment plant. Secondary disinfected effluent is stored in an effluent reservoir and disposed of the on-site land application areas, an effluent storage reservoir, or Preston Reservoir. CDCR has also built and periodically operates an effluent export pipeline to discharge effluent to the City of Ione tertiary plant for further treatment and irrigation of the Castle Oaks Golf Course. This off-site beneficial reuse is not described or permitted in the current WDRs.

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| Insufficient flow and composition data to determine threat to water quality and public health posed by the treatment and disposal of the industrial wastewater | Revised Monitoring and Reporting Program (MRP) R5-2015-0129 was issued in October 2021 to require monitoring necessary to collect needed data. Based on that data, the WDRs will be updated to ensure beneficial uses are protected. Data will also be sent to the County to make public health recommendations. |
| Lack of treatment process for industrial waste | Future WDRs will be developed using the data on the industrial waste stream collected under Revised MRP R5-2015-0129 and will include requirements and upgrades to the treatment train as needed to address industrial waste constituents. |
| Insufficient wastewater effluent disposal capacity | The current WDRs require CDCR to develop additional disposal capacity to make up for the increased prisoner population and loss of spray fields caused by the 2015 prison expansion. However, the disposal plans of Sutter Creek and the City of Ione will change drastically in July 2022. Therefore CDCR, Ione, and Sutter Creek will be required to submit water balances consistent with each other to determine the disposal deficit. |
| Overloading of specific spray fields potentially causing subsurface seepage into Mule Creek | Symptom of insufficient disposal capacity, see above. |
| Nitrate and VOC impacts to groundwater | Symptom of insufficient disposal capacity, see above. |

## Land Discharge Waste Discharge Requirement (WDR) Permit Documents

- All MS4 monitoring reports are available to the public via the Stormwater Multiple Application and Report Tracking System (SMARTS):

  <u>California Storm water Multiple Applications and Report Tracking System</u>

## Industrial Stormwater General Permit (IGP)

CDCR filed a No Exposure Certification (NEC) on 22 May 2018, which certifies that all industrial activities occur indoors and therefore they should be exempt from certain Industrial Stormwater General Permit requirements. Stormwater staff inspected the facility on 27 January 2021 and determined that the NEC is applicable here. Therefore MCSP is not regulated under the IGP.

<u>Industrial Stormwater page</u>

## SSO General Order

On 2 May 2006 the State Water Board adopted the SSO General Order, Order No. 2006-0003-DWQ. This Order requires all federal and state agencies, municipalities, counties, districts, and other public entities that own or operate sanitary sewer systems greater than one mile in length and collect and/or convey untreated or partially treated wastewater to a publicly owned treatment facility to enroll and comply with the requirements described within.

As part of previous enforcement actions taken by the Central Valley Water Board for wastewater spills from the collection system to Mule Creek MCSP, CDCR was enrolled in the SSO General Order on 5 December 2014. The Order includes requirements for the maintenance, monitoring, and repair of the sanitary sewer system. Based on the 1 November 2019 Stormwater Investigation Findings Report, adequate maintenance and repair have not been performed, and the Board is evaluating enforcement.

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| The Stormwater System Investigation Findings Report detailed numerous defects and locations of infiltration in the storm water collection system | Board staff is reviewing the most recent Sanitary Sewer Maintenance Plan and will provide formal communication to CDCR stating how to address these issues and come back into compliance with the SSO General Order. |

## SSO General Order Permit Documents

- <u>Sanitary Sewer Overflow Reduction Program page</u>
- <u>Sanitary Sewer Overflow (SSO) General Order WQO-2006-0003</u>

## Sanitary Sewer Management Plans (SSMP)

2020 SSMP (will provide document, is not currently online)

| Compliance Concern | Strategy to Return to Compliance |
| --- | --- |
| Discharges from the MS4 have been occurring during long periods of dry weather | As part of the 2021 Stipulated Order, CDCR is required to repair the landscape irrigation system. In addition, Central Valley Water Board staff reviewed CDCR's Non-Storm Water Discharge Report and determined that the irrigation runoff from defects in the irrigation system does not meet the Small MS4 General Permit's definition of incidental runoff. As required by the Small MS4 General Permit, CDCR submitted a Non-Storm Water Discharge Elimination Plan (NSWDE Plan) to eliminate the non-storm water runoff. This NSWDE Plan is currently under Central Valley Water Board staff review. |
| The Stormwater System Investigation Findings Report (Report) detailed numerous defects and locations of infiltration in the MS4 system | The Report concluded that there are defects in the sanitary sewer and irrigation systems and MS4. For Non-traditional MS4s, the Small MS4 General Order requires that illicit discharges into MS4 be corrected once the source is identified. |

- Small MS4 General Permit WQ Order 2013-0001-DWQ
- MS4 Designation Resolution R5-2019-0006
- Revised MS4 13383 Order (Replaced on 30 November 2021)
- Revised MS4 13383 Order

## Enforcement Documents

- 14 February 2018 13267 Order (will provide document, is not currently online)
- 1 November 2019 Stormwater Investigation Findings Report (will provide document, is not currently online)
- 7 December 2020 Stormwater Investigation Findings Report Review Memo (will provide document, is not currently online)
- 18 February 2021 Settlement Agreement Administrative Civil Liability Order R5-2021-0001
- 18 February 2021 Board Presentation for ACL Adoption (will provide document, is not currently online)

## Monitoring Reports

- Historical data of the Discharge to Mule Creek collected under the 13267 Order (will provide document, is not currently online)

**Email Subscription List**

Subscribe to the Mule Creek State Prison Compliance Issues and Regulatory Strategy email list to receive notifications and updates.

**Contact Us**

- **Assistant Executive Officer overseeing Enforcement:**
  JJ Baum
  Assistant Executive Officer
  John.Baum@waterboards.ca.gov
- **Land Discharge and Construction and Industrial Stormwater Questions**
  Kari Holmes
  Supervising Water Resource Control Engineer
  Kari.Holmes@waterboards.ca.gov
- **MS4 Questions**
  Anne Walters
  Environmental Program Manager I
  Anne.Walters@waterboards.ca.gov
- **CDCR Questions**
  Gregor Larabee
  Industrial Hygienist
  (916) 255-2162
  Gregor.Larabee@cdcr.ca.gov

- Web page problems: webmaster5@waterboards.ca.gov
- Report an Environmental Concern

# What is tertiary wastewater treatment?

jcfranceindustrie.fr/en/what-is-tertiary-wastewater-treatment/

May 24, 2022

After domestic, agricultural or industrial use, water is polluted by various biological, physical or chemical substances. This wastewater is often reused or discharged into the natural environment. However, before being reused or discharged into the environment, it must undergo a purification process in a wastewater treatment plant. This process is divided into several stages, including the tertiary treatment phase. JC France Industrie explains the essentials of tertiary wastewater treatment.

## Tertiary wastewater treatment: what is it ?

**Tertiary treatment** is a method of <u>wastewater treatment</u> that consists of eliminating non-biodegradable pollutants. It follows primary and secondary treatment. This technique allows the removal of phosphorus and nitrogen contained in the water to refine it. It is based on the use of chemical and physical processes. The tertiary treatment of wastewater uses, for example, the rotary screen which is a very important tool. Indeed, its use optimizes the separation of liquids and small solids.

The tertiary treatment offers the possibility to increase the quality of the effluents before they are discharged into the receiving environment (lake, field, sea, river). It occurs well after <u>screening</u>, which is part of the **pre-treatment steps.** However, several tertiary treatment processes can be used in wastewater treatment plants (WWTP). In any case, this filtration or purification mechanism of polluted water has several interests.

## What are the challenges of tertiary wastewater treatment?

Firstly, the implementation of tertiary treatment is essential to comply with European and national standards on wastewater discharge. In other words, the elimination of phosphorus and other pollutants present in wastewater is a legal obligation.
In France, treated wastewater is most often reused for agricultural irrigation and watering of green areas. The effectiveness of tertiary treatment is therefore essential **to guarantee the quality of the water before its reuse**. The different methods used allow the complete removal of unwanted substances in order to meet predefined quality objectives.

For example, if wastewater is to be reused for vegetable irrigation, pathogens are removed. On the other hand, in the context of urban reuse, nitrogen and phosphorus are targeted during treatment. The same is true for **groundwater recharge**. This helps to avoid any risk of eutrophication.

# How is tertiary wastewater treatment carried out ?

The tertiary treatment of wastewater is based on several methods of depollution. Among these, we have the use of rotary drum filters. These machines allow to filter more finely the polluted water at the level of the STEP. In the same way, a bacteriological treatment by UV radiation can be applied to the water in order to get rid of the substances that pollute it.

## The use of rotary drum filters

Also known as a rotary screen, **the rotary drum filter** is a mechanical filtration device. Often made of stainless steel, it consists of a cylindrical drum with a mesh size of 26µ to 100µ depending on the application. The use of this tool is useful to optimize the separation of liquids and solids that have a minimal size. It is used to properly filter urban effluents and to purify wastewater. Rotary drum filters can be used in wastewater treatment plants (WWTP) as well as for the treatment of drinking water or fish farming.

**The wastewater to be treated** is guided into the drum and flows by gravity through the filter panels attached to the periphery of the screen. Suspended solids are removed by backwashing and gradually accumulate inside the rotating drum filters through a waste collection and discharge chute.

When the difference in level between upstream and downstream is too great, the screen rotates. This starts the cleaning cycle in order to filter the SS that are on the filter cloth. The water coming from the cleaning of the cloths is then recovered and evacuated independently of the filtered water.

## Bacteriological treatment by UV radiation

A variety of UV systems are available to eliminate bacteria from wastewater. In fact, the principle of UV treatment consists in purifying wastewater by subjecting it to a source of UV radiation. In concrete terms, the polluted water is treated in a channel containing **a multitude of submerged lamps.**

In recent years, small wastewater filtration plants have been using a system based on single-lamp reactors. In any case, the bacteriological treatment by UV radiation helps to destroy many harmful bacteria.

Ultimately, the operation of a wastewater treatment plant is divided into several phases. After pre-treatment, primary treatment and secondary treatment, tertiary treatment is necessary to improve the quality of the treated water. It is possible to use the solutions proposed by JC France Industrie for wastewater treatment.

- WDR R5-2015-0129
- Revised Monitoring and Reporting Program R5-2015-0129 (Rev1)

## Recent Enforcement Documents

23 September 2020 Notice of Violation (will provide document, is not currently online)

## Monitoring Reports

Please contact us for copies of these documents.

- Monthly Waste Water Treatment Plant Reports required by WDRs (will provide document, is not currently online)
- Quarterly Groundwater Reports required by WDRs (will provide document, is not currently online)
- Annual Reports required by WDRs (will provide document, is not currently online)

## Small Municipal Separate Storm Sewer System (MS4)

On 28 December 2017, Central Valley Water Board staff received a complaint of ongoing illegal discharge of wastewater from an unknown source into the storm water system and subsequently into Mule Creek. In response, Central Valley Water Board staff inspected MCSP on 4 January 2018 and collected samples. The results indicated that the discharge exhibited the characteristics of domestic and industrial wastewater, and exceeded several applicable regulatory limits, resulting in the issuance of a Water Code Section 13267 Order (13267 Order) on 14 February 2018. As part of the 13267 Order, CDCR completed monitoring and an investigation of the storm water and sanitary sewer systems to determine the source of the waste. It determined that both systems had numerous defects allowing liquid to infiltrate and ex-filtrate and that groundwater was mounded beneath MCSP as a result. CDCR's Investigation Findings Report and Central Valley Water Board Staff's Review Memo for that report are linked below.

During the investigation, Central Valley Water Board staff determined that the storm water system at MCSP may pose a threat to water quality and storm water discharges from MCSP should be regulated under the Small MS4 General Permit. On 8 February 2019 the Central Valley Water Board adopted Resolution R5-2019-0006 designating MCSP as a Non-Traditional MS4, and on 10 April 2019 MCSP was designated as a Regulated Small MS4 by the State Water Resources Control Board (State Water Board). The Small MS4 General Permit requires CDCR to develop and implement a storm water control program for MCSP to reduce the discharge of pollutants from its MS4 to Mule Creek and ensure compliance with applicable water quality requirements. Due to potential water quality impacts to Mule Creek while the MCSP storm water control program is being fully developed and implemented, and to ensure compliance with the Small MS4 General Permit requirements, the Central Valley

Water Board determined that an interim monitoring and reporting program is necessary to monitor MS4 discharges from MCSP to Mule Creek. The Central Valley Water Board issued a 13383 Order to perform monitoring and reporting on 6 August 2020. The 13383 Order was initially updated on 16 December 2020, followed by an additional update on 30 November 2021.

On 18 February 2021, the Central Valley Water Board approved Settlement Agreement and Stipulation for Entry of Administrative Civil Liability and Administrative Civil Liability Order (Stipulated Order), Order No R5-2021-0001 regarding the unpermitted discharge of co-mingled storm water and wastewater to Mule Creek from the MCSP MS4. The scope of the Stipulated Order only included discharges occurring between the discovery of waste constituents in the discharge by Central Valley Water Board staff on 18 January 2018 and 10 April 2019, which is when MCSP enrolled in the Small MS4 General Permit. As part of the Stipulated Order, CDCR agreed to defer funds from the penalty amount to the following Enhanced Compliance Actions (ECAs): a Landscape Irrigation System Replacement Project to repair broken landscape irrigation pipes that are contributing to excessive dry weather flows into the MS4 and a microbiological study (Microbial Study) performed by the Southern California Coastal Water Research Project. The Landscape Irrigation System Replacement Project is expected to be completed in March 2025. The Microbial Study is complete but unfortunately was not performed with EPA-certified methods and was mostly inconclusive, although human biomarkers were detected in Mule Creek.

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| Insufficient flow and composition data to determine threat to water quality and public health posed by the discharges to Mule Creek from the MS4 | The updated 13383 Order requires the collection of monitoring data needed to determine the threat to water quality and public health posed by MS4 discharge. The Small MS4 General Permit requires CDCR to address any illicit discharges occurring to the system once they are found. |

Booked into the jail in April 2022 for throwing a rock at a fire truck, he received no psychiatric care from Wellpath staff before he died seven months later, his legs slashed, his body and cell walls written on with blood. The cause of death: suicide by water intoxication.

The unsealed reports revealed case after case in which Wellpath staff failed to fulfill the firm's contractually obligated mandate to provide jail detainees healthcare—even denying walkers or wheelchairs to disabled detainees and depriving those who were pregnant of prenatal care. One detainee who reported she was raped just before her arrest was denied a rape exam.

The monitor overseeing mental health care cited non-compliance in treatment plans, quality management and staffing. Further, according to one of the plaintiffs' attorneys, Cara Trapani, "For nearly all of October 2022 to January 2023, Wellpath provided no dental care at the jail because it lacked adequate dental staff."

Several deaths at the jail were attributed to the company's non-compliance with its settlement obligations; Monterey County and Wellpath have paid out around $8.5 million in wrongful death cases over the past several years. In other cases, detainees did not receive timely medical care or any at all. Some prisoners who tested positive for tuberculosis (TB) were not isolated, while those who had chronic medical issues, such as HIV, were not seen by doctors until their condition deteriorated.

In granting the recent motion to enforce the settlement, the Court found the facts presented were "sufficient to meet Plaintiffs' burden to show by clear and convincing evidence that Wellpath is not in substantial compliance with forty-three [out of 44] specific requirements."

"Perhaps recognizing that the task would be impossible," the Court added, "Wellpath makes no effort to show why it could not comply with the [settlement] requirements at issue." To ensure future compliance, coercive sanctions were ordered "in the hope that a threat to its bottom line may galvanize compliance where other measures have failed."

Accordingly, Wellpath was held in civil contempt and conditionally ordered to pay $25,000 for each of the 43 non-compliant settlement agreement provisions with which it remained noncompliant after six

months. Due to one continued non-compliance, following each monitor report, additional $25,000 fines per provision may be imposed. Two provisions related to mental health medications, which had previously been discontinued, were also reinstated. See: *Hernandez v. Cty. of Monterey*, 2023 U.S. Dist. LEXIS 171877 (N.D. Cal.).

In 2022 Monterey County renewed its contract with Wellpath to provide healthcare at the jail for another three years, at a total cost of $44.3 million. Meanwhile, *Voices of Monterey Bay* reported in August 2023 that Wellpath co-CEO Tony Tamer

had recently purchased a $25 million mansion in Miami.

The settlement agreement remains in effect; Plaintiffs are represented by attorneys with the National Prison Project of the American Civil Liberties Union (ACLU), the ACLU Foundation of Northern California and the firm of Rosen, Bien, Galvan & Grunfeld LLP. See: *Hernandez v. County of Monterey*, U.S.D.C.(N.D. Cal.), Case No. 5:13-cv-02354. █

Additional sources: *Voices of Monterey Bay*, *Monterey County Weekly*

# CLASS ACTION LAWSUIT CHALLENGING THE HIGH PRICES OF PHONE CALLS WITH INCARCERATED PEOPLE

Several family members of incarcerated individuals have filed an important class action lawsuit in Maryland. The lawsuit alleges that three large corporations – GTL, Securus, and 3CI – have overcharged thousands of families for making phone calls to incarcerated loved ones. Specifically, the lawsuit alleges that the three companies secretly fixed the prices of those phone calls and, as a result, charged family members a whopping $14.99 or $9.99 per call. The lawsuit seeks to recover money for those who overpaid for phone calls with incarcerated loved ones.

**If you paid $14.99 or $9.99 for a phone call with an incarcerated individual, you may be eligible to participate in this ongoing lawsuit.**

Notably, you would not have to pay any money or expenses to participate in this important lawsuit. The law firms litigating this case—including the Human Rights Defense Center—will only be compensated if the case is successful and that compensation will come solely from monies obtained from the defendants.

If you are interested in joining or learning more about this case, please contact the Human Rights Defense Center at (561)-360-2523 or info@humanrightsdefensecenter.org.

*ADVERTISING MATERIAL*

# California Prison Fined $1.7 Million for Stormwater Discharges, Environmental Violations

On August 1, 2023, the federal court for the Eastern District of California approved a $1.7 million payment to settle lawsuits accusing the state Department of Corrections and Rehabilitation (CDCR) of fouling the environment around Mule Creek State Prison (MCSP) with polluted stormwater discharges.

As part of the Prison Ecology Project of its publisher, the Human Rights Defense Center, *PLN* has reported extensively on environmental violations by prisons and jails, including sewage and stormwater discharges; the latter is particularly problematic where stormwater carries pollutants from roads and irrigation ditches into local watersheds. In California, CDCR has been repeatedly cited for such pollutant spills over the past two decades. [See: *PLN*, Dec. 2017, p.1.]

The latest settlement resolves two suits, the first filed in December 2020 by the nonprofit California Sportfishing Protection Alliance (CSPA), accusing CDCR Secretary Jeffrey Macomber and MCSP warden Patrick Covello of violating the federal Clean Water Act, 33 U.S.C. § 1365(a), by polluting the Mule Creek waterway with dirty stormwater discharges. Amador County officials filed a similar lawsuit the following month.

The two cases, which sought injunctive and declaratory relief, were consolidated, and the Court then partially granted the parties' motions for summary judgment on January 11, 2023. *See: Cal. Sportfishing Prot. All. v. Allison*, 2023 U.S. Dist. LEXIS 5045 (E.D. Cal.). A consent decree was reached four months later that the Court ultimately approved. As part of the settlement, CDCR was required to implement a stormwater pollution prevention plan and provide related employee training by October 2023.

Repairs to the prison's wastewater system were also ordered, and they must be completed by July 2030, when the consent decree expires. The repairs had been recommended following a CDCR investigation into stormwater discharges ordered by the Regional Water Board in 2018. While CDCR denied liability, it agreed to pay $1.7 million to reimburse Plaintiffs' expenses, including costs, consultants, expert witnesses and attorney fees. Of that amount, $880,000 was payable to CSPA and $820,000 to Amador County.

Additionally, CDCR will perform "nest control" to "reduce impacts of birds on water quality"; identify and protect storm drains; and conduct inspections, monitoring, sampling and reporting of stormwater discharges. Plaintiffs will be allowed to perform annual inspections while the consent decree is in effect, and CDCR must provide yearly reports on its compliance with the settlement terms and pay an annual monitoring fee ranging from $17,500 to $30,000. *See: Cal. Sportfishing Prot. All. v. Macomber*, USDC (E.D. Cal.), Case No. 2:20-cv-02482.

The $1.7 million payout was only the latest by CDCR for environmental violations, including, a $2.3 million penalty assessed in 2017 for wastewater discharges at the Deuel Vocational Institution. [See: *PLN*, Aug. 2018, p.40.]

# Seventh Circuit Reinstates Wisconsin Prisoner's ADA Claim for Untreated Knee Injury

## by Matt Clarke

On August 25, 2023, the U.S. Court of Appeals for the Seventh Circuit reinstated a Wisconsin prisoner's claim that officials with the state Department of Corrections (DOC) violated Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. ch. 126 § 12101, et seq., by refusing to make reasonable accommodations for his injured knee and assign him to a lower bunk.

After Lee A. Brown fell and injured his knee at Redgranite Correctional Institution in October 2020, he was accommodated with a wheelchair, crutches and assignment to a lower bunk. Several weeks later, he was transferred to Oshkosh Correctional Institution (OCI) and housed in a single-bunk segregation cell. Multiple requests for medical treatment for his knee then went ignored, he said, and OCI officials moved him to general population. He was assigned to a two-person cell where another disabled prisoner already had the lower bunk. After Brown fell climbing onto the top bunk, a prison doctor told him that he needed knee surgery, but DOC would not approve it because he was "too young."

Brown requested that the "special needs committee" provide "accommodations." That request was refused. He then filed suit *pro se* in federal court for the Eastern District of Wisconsin, accusing OCI officials and medical administrator Dawn Fofana of failing to provide reasonable accommodation for his disability when they refused to assign him to a lower bunk and failing to provide medical care for his injured knee while in segregation.

The trial court dismissed the ADA claim at the screening phase, holding that it was an allegation of "inadequate medical treatment, which is not a proper claim under the ADA." Later, the same court granted Fofana summary judgment after finding she was not involved in provision of medical care. With the assistance of D.C. attorney Samuel Weiss of Rights Behind Bars, Brown appealed dismissal of the ADA claim.

He contended it was a "failure-to-accommodate" claim if he did not use that exact term, citing *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667 (7th Cir. 2012), to argue that pleading standards were not that exacting. The Seventh Circuit agreed that he was required to plead only that he is a "qualified individual with a disability" who "by reason of such disability" was "denied the benefits or the services, programs or activities of a public entity," borrowing language from ADA. "An allegation that the defendant failed to make reasonable accommodations can state a violation of Title II of the ADA," the Court said, pointing to *Shawn v. Keller*, 52 F.4th 331 (7th Cir. 2022).

The Court rejected Defendants' asser-



# BIOHAZARD

MULE CREEK PRISON HAS ILLEGALY DISCHARGED SEWAGE AND CONTAMINATED
WASTE WATER INTO THIS CREEK FOR OVER 20 YEARS! DO NOT ALLOW YOUR
CHILDREN OR PETS TO CONTACT THE WATER DUE TO HEALTH ISSUES
EXPERIENCED BY THOSE WHO DID.

FILE CW-241842

REGIONAL WATER
916-464-4670

SIGN BY
STUDENTS FOR
CLEAN ENVIROMENT

Frank Orlando WELLS F06517
101 Hwy 104
Ione CA 95640